# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued February 10, 2014        Decided July 11, 2014

No. 12-3009

UNITED STATES OF AMERICA,
APPELLEE

v.

IGNACIO LEAL GARCIA, ALSO KNOWN AS CAMILO, ALSO
KNOWN AS TUERTO,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:04-cr-00446-42)

*Carmen D. Hernandez*, appointed by the court, argued the cause and filed the brief for appellant.

*Michael A. Levy*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Ronald C. Machen Jr.*, U.S. Attorney, and *Randall W. Jackson*, Special Assistant U.S. Attorney.

Before: GRIFFITH, KAVANAUGH and SRINIVASAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: The Fuerzas Armadas Revolucionarias de Colombia (FARC) is a left-wing guerilla group that has waged a violent insurgency against Colombia's government for much of the last fifty years. FARC finances its operations largely through manufacturing and trafficking cocaine, which it exports throughout the world. Appellant Ignacio Leal Garcia was part of the regional leadership of FARC and was convicted by the district court of conspiring to import cocaine into the United States. Garcia challenges the fact of his conviction and the length of his sentence, but for the reasons set forth below we reject his arguments.

I

FARC acts through approximately seventy regional organizational units called "Fronts." For at least ten years, until 2009, Garcia was part of the leadership of the Tenth Front, which operates in the Arauca region of Colombia. March 2006 a grand jury indicted Garcia and charged him with conspiring to smuggle into the United States five kilograms or more of cocaine in violation of 21 U.S.C. § 960(a). He was tried by a jury in 2011.

Although Garcia called no witnesses, his theory of the case was that he was involved only in FARC's political activities and had nothing to do with its drug trafficking operations. But the government offered extensive evidence of his drug-trafficking activities. For example, the government submitted a letter on FARC letterhead, signed by Garcia and written in handwriting that witnesses identified as his, which advised members of a rival guerilla organization not to disturb a group of FARC's coca farmers. The government also introduced photographs of Garcia in his FARC military uniform holding an assault rifle and a recording of radio

intercepts of Garcia speaking with other FARC members about their weapons. A Colombian civilian testified that he had repeatedly transported cocaine, hidden in a compartment of his truck, at Garcia's command. Another individual, who had worked undercover at the direction of the Colombian Army, testified that he had repeatedly purchased large quantities of cocaine from Garcia. He also testified that Garcia had directed him to help arrange eighty-seven separate airplane flights, each carrying hundreds of kilograms of cocaine primarily destined for the United States. He further explained that on more than one occasion he had seen the planes returned filled with cash, often U.S. dollars, and had helped deliver that cash to Garcia. Finally, eight former members of FARC, now in the "*Reinsertado*" Colombian witness protection program, testified that Garcia had at times served as the Tenth Front's financial leader, managing the manufacture and export of cocaine to the United States, Europe, and Mexico.

The jury found Garcia guilty. Because of the quantity of drugs involved in the conspiracy, the district court determined that Garcia's crime carried a potential sentence of life imprisonment and a mandatory minimum of ten years. *See* 21 U.S.C. § 960(b)(1). He was sentenced to 294 months' imprisonment.

We have jurisdiction to hear Garcia's appeal under 28 U.S.C. § 1291. We consider the appeal of his conviction in Part II and the appeal of his sentence in Part III.

II

The central difficulty Garcia faces in challenging his conviction is that the evidence of his guilt was overwhelming.

That mountain of evidence against him renders his various arguments insignificant. Even if Garcia were right and the district court erred in the ways he asserts, none of the alleged errors—nor even all in combination—call the verdict into doubt. *See United States v. Powell*, 334 F.3d 42, 45 (D.C. Cir. 2003) (setting forth the harmless error standards for constitutional and non-constitutional errors).

A

At trial, Garcia tried to impeach the *Reinsertado* witnesses with reports made by the Colombian military summarizing what the witnesses had told authorities in interviews conducted just after their defections from FARC. None of the reports made any mention of Garcia as a financial leader, a fact he tried to use to show that the testimony of the *Reinsertado* witnesses describing his extensive involvement in FARC's drug trafficking was false.

Garcia contends that the district court refused to allow him to use the reports to impeach the *Reinsertado* witnesses in violation of the Confrontation Clause of the Sixth Amendment, which "secure[s] for the opponent the opportunity of cross-examination." *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986) (internal quotation marks and emphasis omitted). We are baffled by Garcia's argument on this point because it is clear from the trial record that the district court *did* allow Garcia to use the reports as a basis for cross-examination by asking witnesses whether they had mentioned Garcia during their intake interviews. If a witness could not remember, the court allowed Garcia to use the reports to refresh the witness's memory. Beyond making a general assertion that he was denied the ability to confront the *Reinsertado* witnesses with these reports, Garcia utterly fails

to specify which of the court's rulings were unreasonable and how, if the court had ruled differently, he would have been able to further undermine the credibility of the *Reinsertado* witnesses.

But even had the court misstepped in restricting Garcia's use of the reports, its error would have been harmless. *See id.* at 684 (applying harmless error analysis to Confrontation Clause claim). The reports offer weak proof, if any, of inconsistency or omission by the *Reinsertado* witnesses because there are ample reasons why the reports would not mention Garcia. In the first place, the reports are only summaries of interviews and contain but a small portion of what the witnesses told the military about their time in FARC. Furthermore, the person conducting the interviews may not have asked any questions that required the witness to mention Garcia's name or his role and, if a witness did refer to Garcia, there may not have been a reason to include that detail in the report. And most importantly, there was overwhelming evidence of Garcia's leadership role in FARC other than the testimony of the *Reinsertado* witnesses. Even if Garcia had somehow been able to use the reports to show that all eight of the *Reinsertado* witnesses were lying during trial, the testimony from other witnesses, the photographs, the handwritten letter by Garcia, and the radio intercept clearly established Garcia's role in FARC's drug trafficking. *See Mitchell v. Esparza*, 540 U.S. 12, 17-18 (2003) (per curiam) ("A constitutional error is harmless when it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (internal quotation marks omitted)); *see also United States v. Wilson*, 605 F.3d 985, 1014 (D.C. Cir. 2010) (per curiam).

B

Garcia sees a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), which forbids the "suppression by the prosecution of evidence favorable to an accused," *id.* at 87, in the government's disclosure of the *Reinsertado* reports only two weeks before trial. But Garcia fails to tell us when the government first learned of the reports, what efforts were made to gain them from the Colombian government, or how long after obtaining the reports the government disclosed them. In fact nothing in the record suggests anything other than that the government disclosed the reports to Garcia as soon as it obtained them from the Colombian authorities.

Moreover, the timing of the disclosure in and of itself cannot make out a *Brady* violation. To establish a *Brady* violation, Garcia "must show a reasonable probability that an earlier disclosure would have changed the trial's result." *United States v. Andrews*, 532 F.3d 900, 907 (D.C. Cir. 2008) (internal quotation marks omitted); *see United States v. Johnson*, 519 F.3d 478, 488 (D.C. Cir. 2008) ("The defendant bears the burden of showing a reasonable probability of a different outcome."). Garcia's brief fails to address, in even the most cursory fashion, how earlier disclosure of the *Reinsertado* reports would have changed the outcome at trial. Although Garcia suggested for the first time at oral argument that earlier disclosure might have allowed him to find a witness who could lay an adequate foundation for the admission of the reports as business records, he made no showing at all that it was the government's delay that hampered his efforts. In the two weeks before trial that Garcia had the reports, he neither sent for a Colombian witness nor asked for a continuance to allow more time to do so. And even assuming Garcia had found such a witness, we have

already explained why he has failed to show that admitting the reports was likely to have changed the trial's outcome.

C

Garcia faults the district court for admitting into evidence two exhibits for which he claims the prosecution had failed to establish an adequate chain of custody. "Chain of custody" evidence typically "entail[s] testimony that traces the [possession] of the item from the moment it was found to its appearance in the courtroom." 2 McCORMICK ON EVIDENCE § 213, at 14 (7th ed. 2013). In order for evidence to be admissible, however, a "complete chain of custody need not always be proved. The standard of proof requires only evidence from which the trier could reasonably believe that an item still is what the proponent claims it to be." *Id.* at 15-16 (footnote omitted); *see also* FED. R. EVID. 901(a). The proponent of the evidence must only "demonstrate that, as a matter of reasonable probability, possibilities of misidentification and adulteration have been eliminated." *United States v. Mejia*, 597 F.3d 1329, 1335-36 (D.C. Cir. 2010) (internal quotation marks omitted). Once the evidence is admitted, gaps in the chain of custody affect only the weight it is given by the trier of fact. *Id.*

Through the testimony of *Reinsertado* witness Francisco Novoa, the government introduced a video seized by the Colombian military during a raid of the Tenth Front in 2006. The video appeared to be a training video made by FARC that showed its members practicing with weapons and explosives. The video also contained some still images, including a photograph of Garcia. To establish the needed chain of custody, Novoa testified that he was present during the military raid and watched the video a few days later. Novoa

confirmed that the video introduced into evidence was the same as the one he viewed just after the raid. The district court admitted the video over Garcia's objection, ruling that there was no evidence to suggest that the video was anything other than what it appeared to be. Garcia argues now that the district court erred because no official testified regarding the location of the video between the time it was recovered in the raid and the viewing by Novoa days later. The court should not have admitted the video, he argues, because this gap in the chain of custody creates the distinct possibility that the photo of Garcia was added to the video after its seizure.

Through the testimony of Colombian prosecutor Carlos Munoz, the prosecution also introduced into evidence a printout of the documents from a computer seized during a raid of FARC in 2002. According to Munoz, he received the printouts within a few days of the raid. Although he had since lost track of the seized computer and the printouts, Munoz testified that the printouts in the courtroom were a copy of the ones he had viewed in 2002. Another witness corroborated Munoz's statement by testifying that he recognized some of the printouts as FARC rules. He explained that he had created the rules at Garcia's direction, implicating Garcia as a FARC leader. Garcia objected, pointing to the nearly ten-year gap in the chain of custody, but the court let the printouts into evidence, finding that they were what the government claimed them to be. Garcia now renews that objection on appeal.

Like other evidentiary rulings, a district court's decision to admit evidence over a chain-of-custody objection is subject to harmless error review. *See Mejia*, 597 F.3d at 1337. We need not determine here whether Garcia's objections have merit because neither the video nor the printouts was needed to show that Garcia was involved with FARC's drug

trafficking. Numerous witnesses and much physical evidence firmly established that he was. Because we can "say with fair assurance" that the admission of the video and printouts "did not substantially affect the jury's verdict," any error in admitting them was harmless. *United States v. Hampton*, 718 F.3d 978, 984 (D.C. Cir. 2013) (internal quotation marks omitted) (addressing non-constitutional errors).

III

Federal law prohibits the knowing and intentional importation of a controlled substance into the United States, or the manufacture of the substance knowing or intending that it will be imported into the United States. 21 U.S.C. § 960(a)(1), (3). The base penalty for a cocaine-related violation of § 960(a) is a sentence of not more than twenty years, *see id.* § 960(b)(3), but if the violation "involv[es]" five kilograms or more, the range shifts upward to a minimum of ten years and a maximum of life, *see id.* § 960(b)(1)(B). Garcia was charged under § 963 with conspiring to commit a violation of § 960(a) that involved five kilograms or more of cocaine. Although the jury found that the conspiracy involved five or more kilograms, it made no finding that Garcia should have foreseen that the conspiracy would involve this amount. Garcia argues that applying the higher sentencing range without such a jury finding violated the Sixth Amendment. *See Alleyne v. United States*, 133 S. Ct. 2151, 2155 (2013) ("[A]ny fact that increases the mandatory minimum is an 'element' that must be submitted to the jury."); *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000).

Garcia is correct that the trial judge did not instruct the jury to make a finding as to the quantity of drugs involved in the conspiracy that was reasonably foreseeable to him. But

did the jury need to make such a finding? If Garcia had been charged with a count of importation directly under § 960, rather than a conspiracy count under § 963, the answer presumably would be no. In *United States v. Branham*, 515 F.3d 1268, 1275-76 (D.C. Cir. 2008), this court held that under 21 U.S.C. § 841, which is structurally and textually analogous to § 960, a defendant's *knowledge* of the drug type or quantity is not an element of the offense. Thus, a drug mule who believed he was smuggling only one kilogram of marijuana across the border, but was actually carrying ten kilograms of cocaine, would be subject to the higher sentencing range so long as the jury found that the offense "involv[ed]" five kilograms of cocaine or more. On this point, all twelve regional circuit courts of appeal are in agreement. *See id.* at 1275 n.3 (collecting cases); *see also United States v. Carranza*, 289 F.3d 634, 644 (9th Cir. 2002) (same principle applies to both § 841 and § 960).

There is some disagreement, however, about what knowledge is required to convict a defendant of conspiracy. The majority view is that the defendant's knowledge of the drug type and quantity involved remains irrelevant. On this view, once the jury finds the defendant guilty of joining the conspiracy, his statutory penalty range is established by the jury's determination of the type and quantity of drugs attributable to the entire conspiracy, regardless of whether the individual defendant should have foreseen the amount used. *See, e.g.*, *United States v. Robinson*, 547 F.3d 632, 639-40 (6th Cir. 2008) (collecting cases). On the majority view, the type and amount of drugs foreseeable to a particular defendant remain relevant only to determining his sentence *within* the statutory range. *See, e.g.*, *United States v. Knight*, 342 F.3d 697, 710 (7th Cir. 2003) ("[O]nce the jury has determined that the conspiracy involved a type and quantity

of drugs sufficient to justify a sentence above the default statutory maximum and has found a particular defendant guilty of participation in the conspiracy, the judge may lawfully determine the drug quantity attributable to that defendant and sentence him accordingly. . . ." (internal quotation marks omitted)).

But several circuits have held that the law requires a jury to determine the type and quantity of drugs the defendant should have reasonably foreseen the conspiracy would involve. *See, e.g.*, *United States v. Collins*, 415 F.3d 304, 311-14 (4th Cir. 2005); *United States v. Banuelos*, 322 F.3d 700, 704 (9th Cir. 2003). As Garcia notes, our opinion in *United States v. Law*, 528 F.3d 888 (D.C. Cir. 2008), appears to support this minority view. *See id.* at 906 ("[A] defendant convicted of conspiracy to deal drugs . . . must be sentenced . . . for the quantity of drugs the jury attributes to him as a reasonably foreseeable part of the conspiracy."). But *Law* did not directly confront the *Apprendi* argument Garcia raises. And in the most recent case where this issue was squarely raised, we did not reach the matter. *See United States v. Lopesierra-Gutierrez*, 708 F.3d 193, 208 (D.C. Cir. 2013), *cert. denied*, 134 S. Ct. 330 (2013) ("According to Lopesierra, *Apprendi* required the jury to find the quantity of drugs attributable to Lopesierra individually—as opposed to the quantity attributable to the conspiracy as a whole. But we need not resolve this issue, for even assuming *Apprendi* error, such error was harmless.").

Nor need we do so here. We review the district court's decision for plain error because Garcia failed to argue below that the district court should have asked the jury to find the quantity of cocaine attributable to him. *See United States v. Fields*, 251 F.3d 1041, 1044-45 (D.C. Cir. 2001). The

Supreme Court has held that there is no plain error when, in a case where the jury does not make a required finding relating to drug quantity, the evidence of the higher drug quantity is "overwhelming." *United States v. Cotton*, 535 U.S. 625, 633 (2002); *see also United States v. Mouling*, 557 F.3d 658, 666 (D.C. Cir. 2009), *abrogated on other grounds by Henderson v. United States*, 133 S. Ct. 1121 (2013); *United States v. Johnson*, 331 F.3d 962, 968 (D.C. Cir. 2003). Here there can be no doubt that it was reasonably foreseeable to Garcia that the massive drug trafficking operation he managed involved at least five kilograms of cocaine. The evidence was overwhelming. Indeed, the district court concluded that, based on all the evidence presented at trial, Garcia was *personally* involved in the manufacture and import of more than *7,000* kilograms. And this, said the district court, was "a conservative figure." Garcia offers us no reason to think the district court's estimate was flawed in any way. We conclude that any *Apprendi* error is not reversible.

## IV

We have given full consideration to the various additional arguments that Garcia raises, but find none convincing or worthy of discussion. We therefore affirm his conviction and sentence.